# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re | ) Case No. 08-44581-659 |
| | ) |
| VISIONARY IMAGING, LLC, | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| | ) |
| A. THOMAS DEWOSKIN, as Chapter 7 | ) Adv. No. 09-04220 |
| Trustee of Visionary Imaging, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| IMAGING ADVANTAGE, LLC, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For his Opposition to Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P.

56(c)(1)(B), incorporated by Fed. R. Bankr. P. 7056, Plaintiff A. Thomas DeWoskin, as Chapter 7

Trustee for Visionary Imaging, LLC (the "Plaintiff"), states:

## I.     INTRODUCTION AND UNCONTROVERTED FACTS

Plaintiff seeks to recover $233,376.86 in preferential transfers (the "Transfers") that

Debtor Visionary Imaging, LLC ("Debtor") made to Defendant Imaging Advantage

("Defendant"). Plaintiff moved for summary judgment in his favor on November 9, 2010.

Defendant filed a "Memorandum in Opposition to Plaintiff's Motion for Summary Judgment"

and a cross-motion for summary judgment on November 30, 2010 (collectively the

"Memorandum") in which it raised two primary objections to summary judgment in Plaintiff's

favor: Defendant urges that the Transfers were not Debtor's property and that they were not

made to a creditor for or on account of an antecedent debt.[1]  Both objections are baseless for the following reasons and judgment should be entered for Plaintiff.

### A.     Response to Defendant's Statement of Uncontroverted Material Facts

As required by L.R. 7056(C), Plaintiff first sets forth its admissions and denials of Defendant's factual statements.  Plaintiff admits each of the factual statements Defendant asserts in Paragraphs 1, 2, 3, 4, and 6 of its Motion for Summary Judgment.  With respect to the assertions in Paragraph 5 of Defendant's Motion for Summary Judgment, Plaintiff states that both Paragraph 5 and the testimony to which it refers represent legal conclusions to which no response is required.  To the extent a response is required, Plaintiff denies the assertions in Paragraph 5 because the uncontroverted testimony demonstrates that Debtor and Defendant intended that Debtor receive the "mixed money" at issue here and that Debtor's receipt of "mixed money" created an obligation to pay pursuant to the agreement between Debtor and Defendant to which Thomas Frenz testified.  [Deposition of Thomas R. Frenz ("Frenz depo"), pp. 29-31, attached as Exhibit 1 to Plaintiff's Motion for Summary Judgment].

### B.     Defendant's Affirmative Statement of Uncontroverted Material Facts

For ease of reference, this Reply now sets forth the relevant facts that are not in controversy before discussing the substantive issues.  Debtor provided radiologists to community hospitals that were unable or unwilling to maintain their own radiologists on staff.  [*Id.* at 9].  Debtor was founded by Thomas R. Frenz, who also served as Debtor's managing member.  [*Id.* at 7].  Debtor did not process payments Debtor received from hospitals, Medicare, Medicaid, and other entities.  [*Id.* at 12-14].  Rather, Debtor outsourced those functions to another company closely related to Debtor: Western Physicians Data Services ("Western Physicians").  Frenz ran

---

[1] All other elements of the prima facie case are conceded and Defendant has raised no statutory defenses.

Western Physicians and his wife, Christine Frenz, was its majority shareholder. [*Id.* at 13, 93].

Indeed, Debtor and Western Physicians were so closely related that Debtor paid Western

Physicians operating expenses on at least two occasions. [Frenz depo Exhibit 14 (checks 1539

and 1629, attached as Exhibit 4 to Plaintiff's Motion for Summary Judgment].

Defendant–also a Western Physicians client–also provided radiologists to community

hospitals. [*Id.* at 17]. In or around March 2008, Defendant took over Debtor's contracts with

four hospitals and Defendant hired Frenz as an independent contractor "about sixty or ninety"

days later. [*Id.* at 19, 23]. Following that transition, hospitals, Medicare, Medicaid, and other

entities would sometimes remit money to Debtor that was actually owed to Defendant because

those payors would pay for multiple services in a single payment without regard to whether

Defendant or Debtor performed the services. [*Id.* at 49]. These "mixed money" payments–

single payments that were for some services rendered by Defendant and some services rendered

by Debtor–were deposited into several bank accounts of Debtor. [*Id.* at 44-51]. Though nobody

has produced a written agreement, Frenz testified that Debtor and Defendant agreed that Debtor

would pay Defendant for its services that generated "mixed money" approximately once a week.

[*Id.* at 29-31]. Further, in responses to written discovery Defendant stated that according to an

agreement between Defendant and Debtor, Debtor was to pay Defendant an amount equal to the

"mixed money" that was attributable to services provided by Defendant upon Debtor's receipt of

the "mixed money." [Defendant's Responses to Plaintiff's Interrogatories, ¶ 6, attached to

Plaintiff's Motion for Summary Judgment as Exhibit 3]. The record is devoid of any evidence

that Debtor was not obligated to make such payments. There is no evidence in the record that

Defendant ever objected to money paid for its services being deposited into accounts solely held

by Debtor.

788765.2

Debtor exercised sole control over the "mixed money." Frenz's uncontroverted testimony establishes that Debtor did not segregate "mixed money" payments from its other money, nor did not impose any controls on its accounts to ensure that Debtor maintained sufficient money in its accounts to pay to Defendant for its services that gave rise to the "mixed money." [Frenz depo, pp. 49, 79-80, 123]. Further, Debtor used money in the accounts into which "mixed money" was deposited to pay its "general vendors," including Defendant. [*Id.* at 69, 72, 76, 80]. Debtor was the only entity authorized to write checks on Debtor's accounts. [*Id.* at 15, 103]. Finally, Debtor had insufficient funds to pay its creditors and, accordingly, Debtor prioritized which creditors it would pay and which it would not pay. [*Id.* at 75-76, 105-06, 108]. To that end, Frenz literally examined stacks of invoices and determined which creditors should be paid, which should not be, and which accounts had sufficient money to cover the payments to be made. [*Id.* at 50, 105-06, 108]. Because of this arrangement, when Debtor did pay Defendant, the payment often did not come from the same account into which "mixed money" was deposited. [*Id.* at 50].

Against that factual background, Debtor now addresses the arguments Defendant raises in its Memorandum. Each is insufficient to carry Defendant's burden of demonstrating that it is entitled to judgment as a matter of law.

## II.  THE TRANSFERS WERE OF DEBTOR'S PROPERTY

It is a well-established legal presumption that money held in a general, commingled bank account in its name is property of the debtor. As support for this presumption, Plaintiff cited three cases. [Plaintiff's Motion for Summary Judgment, doc. #34, p. 7; Plaintiff's Memorandum

in Support of Summary Judgment, doc. #35, pp. 5-6]. This analysis addresses Defendant's objections to those cases and explains why Defendant's cases are inapplicable on these facts.

Defendant first objects that "Plaintiff incorrectly relies on Defendant's Responses to Plaintiff's Requests for Admission ("Def's RFA Resp."), ¶ 1 as conclusive evidence that there was a transfer of an interest in the property of Visionary Imaging." Defendant mischaracterizes Plaintiff's Motion by omission. In addition to Defendant's admission that Defendant received the Transfers, Plaintiff also attached to its Motion copies of the checks by which the Transfers were effected. The checks clearly demonstrate that the Transfers were made from bank accounts in Debtor's name. [Frenz depo Exhibit 9, attached to the Motion as Exhibit 6]. Commercial paper is self-authenticating under Fed. R. Evid. 902(9), duplicate copies of the checks are admissible as originals pursuant to Fed. R. Evid. 1003, and Defendant produced no evidence bringing the authenticity or accuracy of the check copies into question. Accordingly, the Court should accept the fact that the Transfers were effected by checks drawn on Debtor's deposit accounts.

Defendant does not dispute that there were no spending controls placed on Debtor's bank accounts, including those from which the Transfers were made, nor that Defendant used money in those accounts to pay its general operating expenses. All the same, Defendant argues that Plaintiff is not entitled to the well-established presumption that the money transferred from those general, commingled bank accounts was Debtor's property. Defendant seeks to distinguish the illustrative cases Plaintiff cited for that general rule, but the effort is unavailing.

Defendant begins by arguing that *In re Amdura Corp.*, 75 F.3d 1447 (10th Cir. 1996) is distinguishable from the facts here because Debtor and Defendant were not in a parent-subsidiary relationship and because "Visionary Imaging did not spend the money in its bank

account as it saw fit without regard to whose money it was spending." As to the parent-subsidiary distinction, Defendant offers no citation or analysis as to its legal relevance of that distinction. Certainly *Amdura* does not turn on that distinction. To support its assertion that Debtor did not spend the money "as it saw fit," Defendant urges that Western Physicians–a company controlled by Debtor's principal (Thomas Frenz) and owned by his wife–actually made the Transfers according to "the Explanation of Benefits and internally prepared reports." The uncontroverted testimony given in this case, however, tells a different story. Frenz testified that Western Physicians had "depository authority only" with respect to Debtor's bank accounts and, accordingly, that company could not possibly have effected the Transfers. [*Id.* at 15]. Frenz similarly testified that Western Physicians "would only pay [Debtor's] bills if the managing member, which was myself, would authorize that payment to be made." [*Id.* at 103]. Indeed, this is consistent with the fact that Frenz, in his capacity as managing member of Debtor, determined whether and when any payments were made as part of a process by which he prioritized which creditors would be paid. [Frenz depo, pp. 75-76, 108]. In short, Debtor used the "mixed money" as its own, just like the debtor in *Amdura*. Defendant's attempt to distinguish the facts of that case from those of this proceeding fails.

Defendant also argues that *Amdura* does not control because that case was a turnover action under Section 542(a). The subject of a Section 542 action is "property of the estate" as that term is defined in Section 541. In a seminal case, Section 541 is precisely where the Supreme Court turned to determine what constitutes "property of the debtor" under Section 547(b). *Begier v. IRS*, 496 U.S. 53, 58-59 (1990). Indeed, the Court held that because certain property was not "property of the estate" under Section 541, it could not be "property of the debtor" for purposes of Section 547(b). *Id.* at 59. In the Court's words, "'property of the estate'

788765.2

. . . serves as the postpetition analog to § 547(b)'s 'property of the debtor.'" *Id.* Accordingly, that *Amdura* deals with a Section 542 action instead of a Section 547 action does not reduce its relevance to the present proceeding. Defendant's claim that the *Amdura* presumption only applies to money still in a commingled account after a bankruptcy filing therefore fails. The presumption applies both pre-petition and post-petition.

Plaintiff also supported its application of the presumption with a preference case. *In re R.W. Leet Electric*, 372 B.R. 846 (6th Cir. BAP 2007). Defendant contends that case should not apply here because Defendant does not suggest "that its funds were held as trust funds under [the Michigan law under which the *Leet* court found a trust]." But Defendant misunderstands the *Leet* proposition. In *Leet*, the court found that the trustee satisfied her burden of proving that the transfers were from the debtor's property by the presumption that money transferred from the debtor's "general, commingled bank account–an account that was not in any form or fashion designated as a trust account[,]" was property of the debtor. *Id.* at 857. Defendant is correct that the *Leet* defendant subsequently overcame that presumption by proving that the funds were held in trust, but Defendant concedes it cannot do that. On the other hand, the elements of the presumption are all present here: the Transfers were made from Debtor's commingled deposit accounts and the accounts were not designated as trust accounts. Accordingly, the presumption applies.

Plaintiff did not directly cite *In re Bullion Reserve of N. Am.*, 836 F.2d 1214 (9th Cir. 1988), but Defendant takes issue with it anyway by claiming it is inapplicable here because the money transferred in that case "was given to the debtor by individual investors in the debtor's Ponzi scheme." Defendant cites no legal authority as to why the fact the money in that case came from defrauded investors is relevant to the present analysis, nor Plaintiff aware of any.

788765.2

Defendant further urges that the deposit accounts from which the Transfers came were controlled by Western Physicians. Defendant does not provide a citation to the record for that assertion, as required to sustain its burden under Fed. R. Civ. P. 56(e)(2), incorporated by Fed. R. Civ. P. 7056, and as required by L.R. 7056(C). However, even the portions of the Frenz deposition to which Defendant cites for other assertions show that Debtor, not Western Physicians, controlled the deposit accounts from which the Transfers were made. For instance, on page 29, Frenz testifies that *Debtor* wrote the checks to Defendant. And on page 32, Frenz testifies that the accounts from which the Transfers were made "were Visionary's accounts" and, accordingly, "[Visionary] would write checks out of those accounts to pay the bills." Finally, as discussed above, Western Physicians had no authority to write checks on Debtor's accounts; instead, Frenz needed to sign the checks in his capacity as managing member of Debtor and only after ensuring that there were sufficient funds in the accounts and that preferred creditors were paid before others.

In summation, the presumption that the money constituting the Transfers was property of the debtor arises here. Further, Defendant has introduced no specific facts or legal arguments to controvert that evidence. Accordingly, the presumption stands.

Defendant next contends that "the majority of the courts have refused to recognize an interest in the property of the debtor when the debtor does not possess the property itself or does not exercise sufficient control over the property." Plaintiff disputes the factual premise of Defendant's legal argument, which is that Debtor did not possess or exercise control over the property comprising the Transfers. Indeed, Defendant cites no evidence to support the application of this proposition to the facts at issue here, and none exists. Despite Defendant's fanciful interpretation of the parties' transactions, the facts plainly demonstrate that

Debtor both possessed and controlled the money transferred to Defendant. As discussed in detail above, uncontroverted documentary evidence demonstrates that the Transfers were made from Debtor's bank accounts, which Debtor used to pay not just Defendant, but other creditors. There were no controls or limitations in place to prevent Defendant from making the Transfers or from using the "mixed money" for other purposes, as it frequently did; Defendant has not attempted to trace the funds that, according to the urging of its counsel, "belonged" to it. Further, only the Debtor–not Western Physicians or any other entity–was permitted to make the Transfers, because they came from bank accounts owned by Debtor alone and that Debtor shared with no other entity. At no time were funds eventually transferred to Defendant segregated in any way from Debtor's general funds. By Defendant's claim that Debtor lacked possession or control of the funds comprising the Transfers, Debtor must have similarly lacked possession and control of all of the money in its bank accounts. Because the facts wholly undermine Defendant's implied claim that Debtor lacked possession or control over the funds in its accounts eventually transferred to Defendant, each case Defendant cited to support its "possession and control" argument is irrelevant. To the extent those cases merit a response, the examination below reveals the inapplicability of each such case to the instant matter.

First, Defendant cites *In re Libby Intern., Inc.*, 247 B.R. 463 (8th Cir. B.A.P. 2000). Defendant cites that case for the proposition that "no transfer of property of the Debtor occurs when a third party pays the creditor directly." The court cites for that proposition a classic earmarking case in which one creditor was substituted for another. *Id.* (citing *Vadnais Lumber Supply Co. v. Byrne*, 100 B.R. 127, 133 (Bankr. D. Mass. 1989)). Thus, *Libby* plainly does not apply to this situation where the Transfers did not merely substitute one creditor for another. Further, the Transfers were not made by a third party.

788765.2

Second, Defendant cites *In re Graphics Technology, Inc.*, 306 B.R. 630 (8th Cir. B.A.P. 2004). Although Defendant cites this case to argue that possession and control are the dispositive issues in determining property of the debtor, neither possession nor control were at issue in that case. Rather, the debtor obtained possession of funds owed to the preference defendant due to the mistake of a third party, and there was no prior agreement between debtor and defendant requiring debtor to pay the money to defendant. *Id.* at 634-35. Here, on the other hand, Debtor and Defendant agreed that the "mixed money" would be deposited into Debtor's account and that Debtor would then pay Defendant the amount attributable to Defendant's services. In other words, there was no mistake involved and therefore Debtor held legal title to the "mixed money." Nonetheless, even after finding that the *Graphics* debtor did not have legal title to the money it possessed due to third-party mistake, the court still found that the money was property of the debtor because it was commingled with the debtor's other money and the preference defendant could not trace it. *Id.* at 635. Here, Defendant admitted in its interrogatory responses that it could not trace the Transfers to the "mixed money" and it has proffered no evidence to do so. [Defendant's Response to Plaintiff's Second Set of Interrogatories ("Def's 2d Interrog. Resp."), ¶ 1, attached hereto as **Exhibit 7**]. Accordingly, even if Debtor had never held legal title to the "mixed money," the BAP for this Circuit would hold that the money still became property of Debtor when it was commingled in Debtor's bank accounts with other money.

Third, Defendant cites *In re Computrex, Inc.*, 403 F.3d 807 (6th Cir. 2005). In that case, money used to pay the defendant's carriers was transferred to the debtor solely so that debtor could pay the defendant's carriers. *Id.* at 810. Therefore, the money was not property of the estate. *Id.* at 810-12. That holding, however, rested on a finding that the debtor was a bailor under Kentucky law. *Id.* at 812. In fact, the Bankruptcy Court for the Northern District of

788765.2

Illinois recently distinguished *Computrex* from the preference action before it precisely because *Computrex* rested on Kentucky bailment law. *In re MarchFirst, Inc.*, 2010 WL 40277723, *7 (Bankr. N.D. Ill. Oct. 14, 2010). That court concluded that, assuming money can be bailed at all, "commingling of the bailed funds with other funds will negate a bailment—at least in the absence of a direction to segregate the funds, for which there is no evidence here." Similarly, no such direction to segregate was present in this case and *Computrex* should be distinguished on that basis. As evinced by this Circuit's BAP holding in *Graphics Technology*, the *MarchFirst* reasoning should hold in this proceeding as well. Further, in Missouri a bailment could not have been created because Defendant did not deliver the "mixed money" to Debtor. *See D.S. Sifers Corp. v. Hallak*, 46 S.W. 3d 11, 16 (Mo. Ct. App. 2001) (citing *Stone v. Crown Diversified Indus. Corp.*, 9 S.W.3d 659, 669 (Mo. Ct. App. 1999)) ("For a bailment contract to exist, there must be delivery *by the bailor* and acceptance by the bailee of the subject matter of the bailment.") (emphasis added); *accord* 8 C.J.S. *Bailments* § 19 (2010) ("Property that is not in existence, or that is to be acquired by a person in the future, is not bailable, that is, no contract with respect to such property can operate by way of bailment until the property has come into existence, or until title to the property or possession of the property has been acquired by the bailor . . . ."). Thus, the reasoning underpinning the *Computrex* decision could not apply in this case.

Fourth, Defendant cites *City of Springfield v. Ostrander*, 329 F.3d 204, 210 (1st Cir. 2003). That case arose when a telecommunications provider entered bankruptcy acting under the federal "E-Rate" program that encouraged public school to connect to the internet. *Id.* at 206. Under that program, schools contracted with telecommunications providers to provide the connection work and paid the provider. *Id.* The private not-for-profit corporation that collected

11

788765.2

the money that funded the program–the Universal Service Administrative Company ("USAC")–would then remit a subsidy payment to the school through the provider. *Id.* In *Ostrander*, the question presented was whether funds the bankrupt service provider received from the USAC to remit to a public school were property of the estate under Section 541. That case found that the funds were not property of the estate because (1) federal law mandated that the transfer go through the service provider before reaching its intended recipient; (2) where the intent that the service provider would be a mere conduit was well-documented in the statute, the Code of Federal Regulations, and agency handbooks; and (3) where there were "restrictive rules" and "intensive oversight" governing the transfer. In this proceeding, on the other hand, there is no federal rule at issue, nobody has produced any documentation of the agreement between Debtor and Defendant, and there was no oversight over how Debtor spent the "mixed money." Thus, the case is clearly distinguishable from the facts at bar.

Fifth, Defendant cites *T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989). Defendant contends the case demonstrates that "funds [were] not part of [debtor-]subcontractor's bankruptcy estate because [they were] held for the sole benefit of materialmen." There, the general contractor and debtor-subcontractor opened a joint account that general contractor controlled. *Id.* at 1374. The case is distinguishable in that the debtor-subcontractor had neither control nor sole ownership of the accounts, whereas Debtor in this case had both sole control and sole ownership of the accounts. While the case considers control and possession, it only supports the proposition that having a debtor's name on a joint account it does not control is insufficient control and possession to make the account funds the debtor's property. That limited proposition does not help Defendant.

788765.2

Finally, Defendant cites *Branch v. Hill, Holliday, Connors, Cosmopolous, Inc.*, 165 B.R. 972, 978 (Bankr. D. Mass. 1994). In that case, the debtor collected money from its subsidiaries in a segregated account and used that money to pay advertising fees. *Id.* at 976. The court noted, however, that the debtor did not use the money in that account for "general corporate purposes" which "might well" lead to the conclusion that the money was not held for the benefit of the subsidiaries and, therefore, was property of the debtor. *Id.* at 978 (citing *Research-Planning, Inc. v. Segal*, 917 F.2d 424 (10th Cir. 1990)). Here, the court's "but if" situation is presented: Debtor did use the "mixed money" for its own corporate expenditures (and those of its related businesses). There was not only insufficient funds in the commingled accounts to pay what Debtor owed Defendant at most times, but Frenz used the money in those accounts to pay Debtor's "general vendors." [Frenz depo, p. 50, 75-76, 108].

In conclusion, none of Defendant's cases counsel against applying the well-established presumption that money in a general, commingled deposit account–such as the money transferred to Defendant here–is property of the debtor. Thus, Plaintiff has presented sufficient evidence on that element of its prima facie case. Further, Defendant has provided no facts that overcome the presumption: there is no evidence the Transfers were not Debtor's property and Defendant concedes it cannot trace the Transfers to the "mixed money" anyway. Accordingly, Defendant has failed to satisfy its burden here and summary judgment remains appropriate.

**III.  EVEN IF THE MONEY TRANSFERRED WAS NOT PROPERTY OF DEBTOR, DEFENDANT MUST STILL RETURN THE TRANSFERS BECAUSE IT CANNOT TRACE THE TRANSFERS BACK TO THE "MIXED MONEY"**

As explained above, well-established law provides that the Transfers were of Debtor's property. Even if that were not so, however, Debtor is still able to recover from Defendant

788765.2

because Defendant cannot trace the Transfers back to the "mixed money" that was allegedly not Debtor's property.

The Eight Circuit Bankruptcy Appellate Panel faced this issue squarely in *In re Graphics Technology, Inc.*, 306 B.R. 630 (8th Cir. B.A.P. 2004). In that case, described briefly above, the preference defendant convinced the court that certain money held in the debtor's bank account was actually the defendant's property, not the debtor's. Notwithstanding that the money was defendant's property, the court still ruled for the preference plaintiff. The court wrote that "[t]o reclaim money or property from a bankruptcy estate on the basis that the property belongs to the reclaiming party and not to the debtor, the reclaiming party must be able to definitively trace its property." *Id.* at 635 (citing *Fore Way Express, Inc. v. Mid-American Lines, Inc.*, 24 B.R. 52, 53 (Bankr. W.D. Mo. 1982). The court continued to note that this requirement applies "[e]ven when property is commingled . . . or else the reclaiming party is relegated to the status of a general unsecured creditor, *regardless of the equities.*" *Id.* (emphasis added).

In this case, Defendant is unable to trace the Transfers back to the "mixed money." When asked about its tracing method during discovery, Defendant stated only that Western Physicians records established the amount of "mixed money" owed to Imaging Advantage– Defendant did not provide any basis to conclude that the Transfers were actually made with "mixed money." [Def's 2d Interrog. Resp. ¶ 1]. In fact, Mr. Frenz's testimony indicates the opposite: creditors, including Imaging Advantage, were paid with any money that was available rather than from specific funds. [Frenz depo, pp. 50-51].

Because Defendant is unable to trace the Transfers back to the "mixed money," it cannot satisfy its burden under *Graphics Technology*. Accordingly, even if this Court concludes that the

788765.2

"mixed money" attributable to services rendered by Defendant is not property of Debtor–which it was–summary judgment in favor of Plaintiff and against Defendant remains appropriate.

## IV. THE TRANSFERS WERE MADE TO A CREDITOR ON ACCOUNT OF AN ANTECEDENT DEBT

Defendant's next line of argument is that the Transfers were not made to a creditor for or on account of antecedent debt. More specifically, Defendant appears to argue (1) that there was no debt and (2) that Defendant and Debtor were not in a debtor-creditor relationship.

Defendant first contends that an antecedent debt requires more than that Debtor "was to remit funds to [Defendant] upon receipt" and that Debtor did not remit the funds until well after receipt. Defendant contends, that it did not invoice Debtor, demand payment from Debtor, or provide "monies, goods, or services" to Debtor.[2] These factors, however, are irrelevant to the creation of debt. A "debt" is liability on a claim. 11 U.S.C. § 101(12). A "claim" is any "right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured or unsecured; or . . . [any] right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(5)(A) & (B). This broad language encompasses the arrangement here where, according to Defendant's own Interrogatory Responses, Debtor was obligated to pay Defendant upon receipt of "mixed money" because Defendant had a "right to payment" pursuant to the parties' agreement.

---

[2] Defendant characterizes the relationship as "Western Physicians simply forward[ing] Imaging Advantage's funds to Imaging Advantage." As exhaustively addressed above, the money in the deposit accounts was property of Debtor and transferred by Debtor. Because Debtor was insolvent at the time of the Transfers, if it were true that Debtor did not receive any value from Defendant for the Transfers, the Transfers were fraudulent pursuant to § 548 and recoverable from Defendant under § 550.

Instead of acknowledging that a Debtor owed a debt to Defendant on account of Debtor's receipt of "mixed money," Defendant contends that "Western Physicians simply forwarded Imaging Advantage's funds to Imaging Advantage." If the Court accepts Defendant's contention, then summary judgment in Plaintiff's favor and against Defendant is appropriate on Plaintiff's second count: fraudulent transfer. Section 548 provides, *inter alia*, that transfers of an interest of the debtor in property made within two years before the date of the filing of the petition are fraudulent transfers if the debtor received less than a reasonably equivalent value in exchange for such transfers and was insolvent on the date the transfers were made. As exhaustively addressed above, the money in the deposit accounts was property of Debtor and transferred by Debtor. Defendant admits the Transfers were made within two years before the Petition Date and that Debtor was insolvent at the time of the Transfers. The only remaining element of a fraudulent transfer claim is that Debtor received less than reasonably equivalent value for the Transfers. If, as Defendant contends, Debtor owed no debt to Defendant that the Transfers extinguished, Defendant could not have received reasonably equivalent value for the Transfers. *See* 11 U.S.C. § 548(d)(2)(A) (defining "value" as "property, or satisfaction or securing of a present or antecedent debt or the debtor"); *In re Singh*, 434 B.R. 298, 309-310 (Bankr. E.D.N.Y. 2010) ("In order to satisfy the statutory requirement for 'reasonably equivalent value' . . . a conveyance must satisfy an antecedent debt, or constitute a present exchange."). Accordingly, if the Court accepts Defendant's contention, Plaintiff will prevail on its fraudulent transfer claim.

Defendant next disputes Plaintiff's characterization of its relationship to Debtor as a debtor-creditor relationship. In doing so, Defendant relies on *Computrex* for its assertion that disbursement of money to the *Computrex* defendant's carriers by the debtor "was not based on

788765.2

the existence of an antecedent debt, but instead a contractual promise to disburse the funds."
Defendant makes two errors in interpreting that case. First, the court expressly noted that it is
not reaching the antecedent debt issue. 403 F.3d at 810 n.1. Second, the court specifically finds
that "[b]ecause the [d]ebtor transferred the funds to [defendant's] creditors, no other obligation
came due that [d]ebtor was required to satisfy. That is, the [d]ebtor has no liability to the freight
carriers or to [defendant] because no obligation 'comes due' unless and until the [d]ebtor, by
misappropriating [defendant's] money, actually fails to pay the freight carriers." *Id.* In other
words, the lack of antecedent debt was not due to the debtor's contractual obligation to pay a
third party, but rather because as long as the debtor actually paid the carriers, no claim (and,
accordingly, no debt) later arose against it. Here, however, Debtor was obligated to pay
Defendant upon receipt of "mixed money." [Def's Interrog. Resp. ¶ 6]. Indeed, Defendant does
not dispute that Debtor was legally obligated to pay Defendant. Accordingly, the *Computrex*
dicta is inapplicable here.

Next, Defendant appears to dispute the well-established principle that a debt is antecedent
if it arises before payment. Defendant cites no authority for its dispute, but rather urges that
Plaintiff's cases "are too dissimilar from the case at hand" and therefore do not "require further
discussion." Plaintiff's cases establish the general proposition that a debt is antecedent if it arises
before payment. That standard is the standard applied in this Circuit–it does not vary based on
the specific facts of each case. Indeed, *In re Bridge Systems*, 311 B.R. 774, 779 (Bankr. E.D.
Mo. 2004) applies that standard in the context of reselling computer component parts. In so
holding, it relies on *In re Iowa Premium Serv. Co.*, 695 F.2d 1109, 1111 (8th Cir. 1982), a case
involving payment on a promissory note. The other case cited by Plaintiff, *In re Jones Truck
Lines*, 130 F.3d 323, 329 (8th Cir. 1997), stated the rule as a general proposition in a case

788765.2

involving payments made to employee benefits plans. In short, the proposition that a debt is antecedent if it is incurred before the allegedly preferential transfer is not dependent on specific facts; rather, it is a static standard that applies across factual scenarios. Defendant's argument on this point is weak at best and tantamount to a concession on this point.

Defendant also asserts that no antecedent debt was created because Defendant did not provide goods or services to Debtor. Defendant does not cite any authority or provide any analysis of why provision of goods or services are required to create an antecedent debt. As explained above, debt arises when a claim accrues which, in turn, occurs when a right to payment arises. Defendant offers no evidence to controvert Frenz's testimony that Debtor was obligated to pay Defendant "upon receipt" of "mixed money." Thus, Defendant's argument is without merit.

Defendant also disputes that it was in a debtor-creditor relationship with Debtor under the principles discussed in *In re Iowa Railroad*, 840 F.2d 535 (7th Cir. 1988). That case considers the relationship formed when payments are made to a single service provider for services provided by multiple service providers. *Id.* at 540-42. That is precisely what occurred here: both Defendant and Debtor provided services, and the recipients of those services paid only Debtor. Defendant misleadingly attempts to distinguish *Iowa Railroad* from this proceeding because that case involved interline railroad carriers. Defendant misses that the court decided that the carriers were in an unsecured debtor-creditor relationship despite the fact they were interline railroad carriers, not because they were interline railroad carriers. *Id.* at 541-42 (comparing interline railroads to sellers of carpets to departments stores, the airline business, the trucking business, and the telecommunications business—all of which are marked by interline balances that courts

788765.2

have held create an unsecured debtor-creditor relationship). That case illuminates that, on facts like those presented here, a finding of an unsecured debtor-creditor relationship is the norm.

## V. CONCLUSION

In its Motion for Summary Judgment, Plaintiff explained how the Transfers here met each element of Section 547(b) based on Defendant's own admissions, the testimony of Defendant's principal, and well-established legal presumptions that operate in its favor. In response, Defendant urges that the legal presumption that money held in a debtor's general, commingled deposit account is the property of the debtor does not apply here. This Memorandum explains, however, that there are no facts in this case that justify departure from that well-established legal presumption.

Further, even if the portion of "mixed money" attributable to services performed by Defendant is found not to be property of Debtor, Debtor is still entitled to recover because Defendant has made no attempt to trace the funds it received back to the "mixed money" as required by *Graphics Technology*. Thus, even if Defendant demonstrates an issue of fact or convinces the Court that some of the money in Debtor's deposit accounts was not Debtor's property, summary judgment in Plaintiff's favor is still appropriate because Defendant's failure to trace the funds mandates Debtor's recovery as a matter of law.

Defendant also urged that the Transfers were not made for or on account of an antecedent debt. Defendant first argued that there was no debt at all because Defendant did not invoice Debtor, demand payment, or provide "monies, goods or services" to Debtor. None of those factors, however, are prerequisites to meeting the definition of "debt" under the Bankruptcy Code. Rather, the evidence here shows that Debtor was obligated to pay the Transfers to Defendant upon receipt of the "mixed money," thereby satisfying the Code's definition of

788765.2

"debt." Defendant next argued that it and Debtor were not in a debtor-creditor relationship despite the holding in *In re Iowa Railroad*, but that argument apparently rested on a fundamental misunderstanding of that case. Accordingly, Defendant has failed to satisfy its burden of setting forth specific facts that controvert Plaintiff's showing that the Transfers were made for or on account of an antecedent debt. Therefore, summary judgment in Plaintiff's favor remains appropriate.

Despite the extensive briefs that have been filed in this proceeding, this case is a simple one. The Transfers comprised Debtor's property, as established by the unrebutted legal presumption that money in a general, commingled deposit account held by a debtor is property of the debtor. Defendant was a creditor of Debtor as established by *In re Iowa Railroad* and by the simple fact that Thomas Frenz–principal of Debtor–actually considered Defendant to be nothing more than a "general vendor." The Transfers were made because Debtor received "mixed money," as evinced by explanatory memoranda on the checks; because the receipt of "mixed money" preceded the Transfers and raised an obligation to pay, the receipt of "mixed money" created a debt that antedated the Transfers. Finally, Defendant admits that the Transfers were made while Debtor was insolvent, that the "hypothetical Chapter 7" element of a preferential transfer is met here, and that Defendant received the Transfers during the 90 days preceding bankruptcy. Thus, each element of a preferential transfer is established with respect to the Transfers and Plaintiff is therefore entitled to avoid the Transfers and recover them from Defendant as a matter of law pursuant to Sections 547(b) and 550(a).

788765.2

DATED: December 6, 2010.     SPENCER FANE BRITT & BROWNE LLP

By _____
Nicholas A. Franke  # MO 37402, EDMO 37402MO
Laura U. Hughes    # MO 60732, EDMO 5212183
Ryan C. Hardy      # MO 62926, EDMO 62926MO
1 North Brentwood Boulevard, 10th Floor
St. Louis, Missouri 63105
Telephone: (314) 863-7733
Facsimile: (314) 862-4656
nfranke@spencerfane.com
lhughes@spencerfane.com
rhardy@spencerfane.com

COUNSEL FOR PLAINTIFF

788765.2

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of December, 2010, I caused a true and correct copy of the foregoing to be served upon the following by depositing copies thereof in the U.S. mail, first class, postage prepaid and by e-mail, addressed as follows:

Spencer P. Desai
Desai Law Firm, LLC
7733 Forsyth Blvd.
Suite 2075
St. Louis, MO 63105

Attorney for Defendant.

_Kim Reedy_

788765.2

EXHIBIT
7

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| VISIONARY IMAGING, LLC, | ) | Case No. 08-44581-659 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | Adv. No. 09-04220 |
| | ) | |
| A. THOMAS DEWOSKIN, as Chapter 7, | ) | |
| Trustee of Visionary Imaging LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ). | |
| | ) | |
| IMAGING ADVANTAGE LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Comes Now Defendant Imaging Advantage, LLC and for its Responses to Plaintiff's Second Set of Interrogatories states:

## DEFINITIONS

The Definitions and Instructions in Plaintiff's First Request for Documents to Defendant served contemporaneously with these Interrogatories are incorporated by reference. In addition:

1. "Identify" means (A) with regard to a person, providing the full name, title, residential address, business address, and telephone number; (B) with regard to a document, providing its title, author, date, recipients, and a description of its general contents; and (C) with regard to a communication, providing the date and place of the communication, the medium of communication (e.g., in-person meeting, email, or telephone), the general topics of the communication, identifying the Person who initiated the communication, and identifying all

0026

persons involved in the communication; and (D) with regard to a company, corporation, association, partnership or legal entity other than a natural person, providing its full name, a description of the type of organization or entity, the address of its principle place of business; the jurisdiction of its incorporation or organization; the date of its incorporation, organization or formation; and the names, as applicable, of its registered agent, board of directors or members, officers and shareholders or other equity interest holders.

2.    "Insolvent" is defined at 11 U.S.C. § 101(32) (2009).

## INTERROGATORIES

1.    Please describe in detail your method of tracing your property in the Debtor's possession during the Preference Period.

**ANSWER:**

Imaging Advantage ("IA") utilized the accounting of Western Physicians to monitor the Debtor's possession of its funds. However, the work of Western Physicians was checked by reviewing the Explanation of Benefits ("EOB") forms and patient payments. Those documents show the dates of service and amounts of payments. The date of service is the demarcation for funds received by the Debtor that were property of IA. Then the amounts paid by 3rd parties were totaled and the balance remitted to IA.

By: _____
SPENCER P. DESAI  (#39877) and (#2974)
7701 Forsyth Boulevard, 12th Floor
St. Louis, Missouri  63105
(314) 721-7701
Fax No. (314) 721-0554

ATTORNEYS FOR DEFENDANT
IMAGING ADVANTAGE, LLC

## CERTIFICATE OF SERVICE

I hereby certify that an original of Defendant's Response to Plaintiff's Second Interrogatories were served on this 30th day of August, 2010, by electronic mail and first class mail to:

Laura Hughes, Esq.
Spencer Fane Britt & Brown LLP
1 North Brentwood Blvd., Ste. 1000
St. Louis, MO 63105

/s/ Wendy M. Hickey

2.

SPENCER FANE BRITT & BROWNE LLP

By: _____
  Nicholas A. Franke #37402
  Laura Uberti Hughes #5212183
  1 North Brentwood Blvd., Ste. 1000
  St. Louis, MO 63105
  (314) 863-7733 (telephone)
  (314) 862-4656 (facsimile)
  nfranke@spencerfane.com
  lhughes@spencerfane.com

  Attorneys for A. Thomas Dewoskin,
  Chapter 7 Trustee

0028

## Hughes, Laura

| | |
|---|---|
| **From:** | Spencer Desai [sdesai@desailawfirmllc.com] |
| **Sent:** | Monday, August 30, 2010 1:09 PM |
| **To:** | Hughes, Laura; Franke, Nicholas |
| **Subject:** | Visionary/Imaging |
| **Attachments:** | Motion for Continuance of Trial Setting 08302010.docx; Defendant's Responses to Ptff's Second Set of Interrogatories.docx |

Counsel:

A couple of items:

1) I have attached responses to your 2nd interrogatories that are with my client for signature. I should have them back tomorrow or Wednesday.

2) The bank statements have been requested and should be here in the next day or two.

3) I am filing the attached Motion for Continuance today.

I have asked my client for approval of the concept of submitting the case on stipulated facts and briefs. Please let me know if this is still something you would like to explore. We can discuss it on the discovery call you requested. I am available for that call between 2-4 today or tomorrow afternoon.

PLEASE NOTE MY NEW CONTACT INFORMATION

Spencer P. Desai
Desai Law Firm, LLC
7733 Forsyth Blvd.
Suite 2075
Clayton, Missouri 63105
314.881.0800 phone
314.881.0808 direct
314.881.0818 fax
sdesai@desailawfirmllc.com email

AV® Preeminent™ Peer Review Rated
www.martindale.com/ratings

This electronic mail message contains CONFIDENTIAL information which is (a) ATTORNEY - CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please reply to the sender and take the steps necessary to delete the message completely from your computer system.

IRS CIRCULAR 230 DISCLOSURE: Unless expressly stated otherwise, any U.S. federal tax advice contained in this e-mail, including attachments, is not intended or written by The Desai Law Firm, LLC to be used, and any such tax advice cannot be used, for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service.